**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-2201, 10-2202 & 10-2325
_____

SHEET METAL WORKERS INTERNATIONAL
ASSOCIATION LOCAL UNION NO. 27, AFL-CIO,
                         Appellant in No. 10-2202

v.

E.P. DONNELLY, INC.;
SAMBE CONSTRUCTION CO., INC.


E.P. DONNELLY, INC,
                         Appellant in No. 10-2201

SAMBE CONSTRUCTION CO., INC,
                         Appellant in No. 10-2325


_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-07-cv-03023)
District Judge: Honorable Renee M. Bumb

_____

11-4480
_____


SHEET METAL WORKERS INTERNATIONAL
ASSOCIATION LOCAL UNION NO. 27, AFL-CIO,
Petitioner

v.

NATIONAL LABOR RELATIONS BOARD; UNITED
BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA, LOCAL UNION NO. 623; E.P.
DONNELLY,
Respondents


_____

12-1047
_____


NATIONAL LABOR RELATIONS BOARD,
Petitioner

v.

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION, LOCAL UNION NO. 27, AFL-CIO;

UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, LOCAL UNION NO. 623,
Respondents

_____

On Petition for Review and Cross-Application for
Enforcement of a Decision and Order of the
National Labor Relations Board
(NLRB Docket No. 4-CD-1188)
_____

Argued February 13, 2013

Before:   McKEE, *Chief Judge*, HARDIMAN, AND
VANASKIE, *Circuit Judges*.

(Filed: December 13, 2013)

Louis Rosner, Esq. (ARGUED)
Suite 2020
123 South Broad Street
Philadelphia, PA 19109
        *Counsel for E.P. Donnelly Inc.*

Mark E. Belland, Esq. (ARGUED)
Steven J. Bushinsky, Esq.
O'Brien, Belland & Bushinsky
1526 Berlin Road
Cherry Hill, NJ 08003
        *Counsel for Sheet Metal Workers International
        Association AFL-CIO Local Union No. 27*

Melissa C. Angeline, Esq.
6352 Lancaster Avenue
Philadelphia, PA 19151

Marc Furman, Esq.
Jonathan Landesman, Esq. (ARGUED)
Cohen, Seglias, Pallas, Greenhall & Furman
30 South 17th Street
19th Floor
Philadelphia, PA 19103-0000
	*Counsel for Sambe Construction Co. Inc.*

Heather S. Beard, Esq. (ARGUED)
Julie B. Broido, Esq.
Linda Dreeben, Esq.
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570
	*Counsel for the National Labor Relations Board*

Raymond G. Heineman, Esq.
Kroll Heineman
99 Wood Avenue South
Metro Corporate Campus I, Suite 307
Iselin, NJ 08830-0000
	*Counsel for United Brotherhood of Carpenters and
	Joiners of America Local Union No. 623*

_____

OPINION
_____

VANASKIE, *Circuit Judge.*

These consolidated appeals arise out of a construction trades jurisdictional dispute concerning whether certain work on a public building should be conducted by sheet metal

4

workers or by carpenters. Sheet Metal Workers' International Association, Local 27, AFL-CIO ("Sheet Metal") petitions this Court for review of the decision and order of the National Labor Relations Board ("the Board" or "NLRB") of December 8, 2011, finding that Sheet Metal violated the National Labor Relations Act by maintaining a section 301 suit against E.P. Donnelly, Inc. ("Donnelly") and Sambe Construction Company, Inc. ("Sambe") following the Board's decision in a section 10(k) proceeding to assign the disputed work to the New Jersey Regional Council of Carpenters and the United States Brotherhood of Carpenters and Joiners of America, Local 623 ("Carpenters"). The Board cross-petitions for enforcement of its order. Also before this Court are three appeals from orders of the District Court entered in connection with the jurisdictional labor dispute. Donnelly appeals from an order of the District Court granting summary judgment in favor of Sheet Metal on its breach of contract claim and awarding Sheet Metal $365,349.75 in compensatory damages. Sheet Metal appeals the District Court's award of nominal damages of $1.00 against Sambe, and Sambe cross-appeals against Sheet Metal on the matters of contract liability and damages. For the reasons that follow, we will deny Sheet Metal's petition for review; grant the Board's petition for enforcement of its December 8, 2011 decision and order; vacate the judgment of the District Court in favor of Sheet Metal on the breach of contract claims against Donnelly and Sambe; and remand the case to the District Court with directions to enter judgment in favor of Donnelly and to conduct further proceedings with respect to Sheet Metal's contract claim asserted against Sambe.

## I. FACTS AND PROCEDURAL HISTORY

5

In 2006, Egg Harbor Township, located in Atlantic County, New Jersey, authorized the construction of the Egg Harbor Township Community Center ("the Project"). In accordance with New Jersey law governing public works projects, the Township adopted a project labor agreement ("the PLA" or "Agreement"), which governed the terms and conditions of the Project's construction.[1] All contractors working on the Project were required to become signatories to

---

[1] New Jersey law authorizes public entities to adopt project labor agreements to govern public works projects

> if the public entity determines, taking into consideration the size, complexity and cost of the public works project, that, with respect to that project the project labor agreement will meet the requirements of section 5 of this act, including promoting labor stability and advancing the interests of the public entity in cost, efficiency, skilled labor force, quality, safety and timeliness.

N.J.S.A. § 52:38-3 (2002). The statute further provides that "[a]ny project labor agreement negotiated pursuant to this act between the public entity or its representative or a construction manager and one or more labor organizations shall be binding on all contractors and subcontractors working on the public works project . . . ." *Id.* § 52:38-4.

the PLA.  The PLA also contained a "supremacy provision," which provided that the PLA "together with the local Collective Bargaining Agreements appended hereto as Schedule A represent[] the complete understanding of all signatories and supersede[] any national agreement, local agreement or other collective bargaining agreement of any type which would otherwise apply to this Project(s), in whole or in part" ("the Supremacy Clause").  (Board Appeals Joint Appendix ["B. J.A."] 100.)

Sambe was selected as the general contractor on the Project and, as required, became a signatory to the PLA.  In early 2007, Sambe subcontracted the Project roofing work to Donnelly.  In accordance with the PLA's requirement that general contractors obtain signed letters of assent from all subcontractors hired to work on the Project, on March 30, 2007, Donnelly executed a letter of assent in which it consented to be bound by the terms and conditions of the PLA, and further agreed that any party it selected to perform the roofing work would also be required to become a signatory to the PLA.

A dispute arose when Donnelly selected Carpenters to perform the roofing work, even though Carpenters was not a signatory to the PLA.  Donnelly apparently hired Carpenters because the two were parties to a collective bargaining agreement ("CBA").[2]  Sheet Metal, which was a signatory to

---

[2]  Both Donnelly and Sambe are signatories to CBAs with Carpenters.  Before the District Court, the parties disputed whether Donnelly and Sambe assented to Sheet Metal's CBA and whether its CBA was appended to the PLA.  The District Court in its March 26, 2010 decision awarding

7

the PLA, protested the work assignment and informed Donnelly that Carpenters could not complete the Project because it had not executed the PLA. Carpenters, in turn, threatened to picket if Donnelly reassigned the roofing work to Sheet Metal. Although Donnelly created conflicting contractual obligations by assenting to both the Carpenters' CBA and the PLA, it refused to reassign the work to Sheet Metal.

In an attempt to settle the work dispute, Sheet Metal initiated an arbitration proceeding pursuant to Article 10 of the PLA.[3] An arbitration hearing was held before arbitrator Stanley Aiges. Donnelly, Sambe, and Sheet Metal participated in the hearing; Carpenters, although made aware

---

Sheet Metal damages concluded that Sheet Metal's CBA was appended to the PLA and was thus binding on Donnelly. *See Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, No. 07-3023, 2010 WL 1257741, at *4 (D.N.J. Mar. 26, 2010) ("*Sheet Metal III*"). The parties apparently do not challenge this conclusion on appeal.

[3] Article 10 sets forth the procedure for resolving jurisdictional disputes between unions and contractors. In summary, a union disputing the assignment of Project-related work is required to submit its objection in writing to a designated administrator, in accordance with the procedure set forth in Article 10. The dispute is then submitted to an arbitrator, whose award is "final and binding on the disputing Local Unions and the involved Contractor on this Project only, and may be enforced in any court of competent jurisdiction." (B. J.A. 122.)

8

of the hearing, did not appear at the proceeding.[4] On June 15, 2007, Arbitrator Aiges issued a short form arbitration decision awarding the disputed work to Sheet Metal ("the Aiges arbitration award").[5]

Carpenters nonetheless persisted in its assertion that it would picket the Project if the work were assigned to Sheet Metal. Donnelly subsequently filed an unfair labor practice charge with the Board pursuant to section 10(k) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 160(k), alleging that Carpenters violated section 8(b)(4)(ii)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(D), "by engaging in proscribed activity [threatening to picket] with an object of forcing [Donnelly] to continue to assign certain work to employees it represents rather than to employees represented by [Sheet Metal]."[6] *United Bhd. of Carpenters &*

---

[4] Carpenters did, however, submit a letter to Aiges objecting to his jurisdiction to resolve the work dispute and to the validity of the PLA generally.

[5] On July 2, 2007, Aiges issued a long form arbitration award confirming the short form decision.

[6] Section 8(b)(4)(ii) makes it is an unfair labor practice for a labor organization

> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is –
> . . .

*Joiners of Am., Local Union No. 623*, 351 N.L.R.B. 1417, 1417 (2007) ("*Local Union No. 623*"). The regional director for the NLRB ordered a section 10(k) hearing to determine the work jurisdiction dispute.[7]

While Donnelly's unfair labor practice charge against Carpenters was pending, Sheet Metal filed a grievance against

---

> (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class . . . .

29 U.S.C. § 158(b)(4)(ii)(D) (2012).

[7] Under section 10(k) of the Act,

> [w]henever it is charged that any person has engaged in an unfair labor practice within the meaning of [section 8(b)(4)(ii)(D)] of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, [unless the dispute is resolved by the parties within 10 days].

29 U.S.C. § 160(k) (2012).

Sambe and Donnelly with the Local Joint Adjustment Board ("the LJAB") pursuant to its own CBA, seeking to confirm the Aiges arbitration award because Donnelly had not yet assigned the disputed work to Sheet Metal.[8] Donnelly and Sambe were invited to participate in the LJAB proceeding, but both declined. Donnelly objected to the LJAB's jurisdiction. One month later, on July 25, 2007, the LJAB issued its decision, finding that Sambe and Donnelly violated the PLA and Sheet Metal's CBA by assigning the roofing work to Carpenters and failing to comply with the Aiges award. The LJAB further held that if the work was not reassigned to Sheet Metal, Sambe and Donnelly would be jointly liable to Sheet Metal for $428,319.26 in lost wages and benefits.

In the meantime, on June 29, 2007, Sheet Metal filed suit against Donnelly and Carpenters in the United States District Court for the District of New Jersey pursuant to section 301 of the Labor Management Relations Act of 1974 ("LMRA"), 29 U.S.C. § 185,[9] seeking declaratory and

---

[8] Sheet Metal's CBA provides an alternative dispute resolution mechanism for settling work disputes between the union and employers: "Grievances not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board . . . . [A] decision of the Local Joint Adjustment Board shall be final and binding." (District Court Appeals Join Appendix ["D.C. J.A."] 146.)

[9] Section 301 of the LMRA authorizes "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting

11

monetary relief, as well as a preliminary injunction to enforce the Aiges arbitration award.[10] Sheet Metal filed an amended complaint in August, 2007, adding a claim against Donnelly for failure to abide by the LJAB arbitration award and joining Sambe as a defendant.

On December 31, 2007, the Board issued a decision and order resolving Donnelly's unfair labor practice charge against Carpenters. *See Local Union No. 623*, 351 N.L.R.B. at 1417. Finding that it had jurisdiction pursuant to section 10(k) of the Act, the Board awarded the disputed roofing work to Carpenters, "relying on the factors of employer preference, current assignment and past practice, and economy and efficiency of operations." *Id.* at 1422. Notwithstanding this award, Sheet Metal continued to pursue its section 301 lawsuit against Donnelly in the District Court. On January 11, 2008, Donnelly filed a second unfair labor practice charge with the Board, this time against Sheet Metal and asserting that Sheet Metal's continued pursuit of the section 301 action after the Board issued the section 10(k) order constituted an unfair labor practice in violation of section 8(b)(4)(ii)(D) because it sought reassignment of work in contravention of a section 10(k) order of the Board.

On March 27, 2008, the District Court denied Sambe and Donnelly's motions to vacate the Aiges arbitration award, finding that it could not evaluate the motions because a

---

commerce . . . or between any such labor organizations . . . ." 29 U.S.C. § 185(a) (2013).

[10] Carpenters was eventually dismissed from the suit.

decision on the validity of the PLA was "premature at [that] time." (D.C. J.A. 20.) The District Court did, however, "touch upon the . . . [parties'] dispute regarding the preclusive effect of the 10(k) decision rendered by the NLRB on December 31, 2007," and emphasized that it "disagree[d]" with Donnelly's argument that because the Board awarded the disputed work to Carpenters, "there is no monetary remedy for [Sheet Metal] even if the PLA is valid and [Donnelly and Sambe] breached that contract."[11] (D.C. J.A. 21.)

In April, 2008, the Board issued a complaint against Sheet Metal, contending that its continued maintenance of the section 301 suit following the Board's section 10(k) order was an unfair labor practice in violation of section 8(b)(4)(ii)(D) of the NLRA.[12] Following a hearing, on May

---

[11] The District Court did, however, grant Sambe and Donnelly's motions to vacate the LJAB award. Sheet Metal does not challenge that aspect of the District Court's ruling, and thus we will not address it.

[12] That month, the Board also petitioned to stay Sheet Metal's section 301 suit pending its resolution of Donnelly's unfair labor practice charge against Sheet Metal. On September 2, 2008, the District Court denied the Board's petition and declined to temporarily stay the section 301 suit. *See Moore-Duncan v. Sheet Metal Workers' Int'l Ass'n, Local 27*, 624 F. Supp. 2d 367, 377 (D.N.J. 2008). The Board appealed, and this Court ordered the appeal be deferred pending disposition of these consolidated appeals. *See Moore-Duncan v. Sheet Metal Workers' Int'l Ass'n Local*

13

29, 2008, an administrative law judge ("the ALJ") found that Sheet Metal violated the NLRA by maintaining the section 301 suit against Donnelly and Sambe after the Board issued its section 10(k) order. Sheet Metal filed exceptions and a supporting brief.

On June 25, 2008, after the Project was completed, Sheet Metal filed a second amended complaint in its section 301 action. Sheet Metal no longer requested reassignment of the Project work, but instead sought monetary damages against Sambe and Donnelly for breach of contract and violations of N.J.S.A. § 52:38-1 *et. seq.*, as well as a declaratory judgment that Donnelly and Sambe are bound by the Aiges arbitration award. Sheet Metal, Sambe, and Donnelly subsequently filed cross-motions for summary judgment.

In December, 2009, the District Court rendered its decision on the parties' summary judgment motions. *See Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 673 F. Supp. 2d 313 (D.N.J. 2009) ("*Sheet Metal I*"). The District Court first granted summary judgment in favor of Donnelly and Sambe on Sheet Metal's claims for violations of the New Jersey statute authorizing project labor agreements, N.J.S.A. 52:38-1 *et seq*.[13] *Id.* at 331. But the District Court granted summary judgment in favor of Sheet Metal on the breach of contract claims, finding that both

---

*Union 27*, No. 08-4437 (3d Cir. May 31, 2012) (order deferring disposition).

[13] Sheet Metal does not appeal this portion of the District Court's decision.

14

Donnelly and Sambe breached the PLA. *See id.* The District Court later awarded Sheet Metal $1.00 in nominal damages against Sambe. *See Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, No. 07-3023, 2010 WL 905616, at *5 (D.N.J. Mar. 9, 2010) ("*Sheet Metal II*"). Following a bench trial on the issue of Donnelly's liability for compensatory damages, the District Court awarded Sheet Metal $365,349.75. *See Sheet Metal III*, 2010 WL 1257741, at *9. The parties timely filed their respective appeals and cross-appeal.

On December 8, 2011, the Board issued a decision and order affirming and reversing in part the ALJ's August 18, 2008 decision with respect to Donnelly's unfair labor practice charge against Sheet Metal. The Board held that Sheet Metal's section 301 suit against Donnelly was an unfair labor practice in violation of section 8(b)(4)(ii)(D) because it "directly conflict[ed] with the Board's 10(k) award." *Sheet Metal Workers' Int'l Ass'n, Local 27*, 357 N.L.R.B. No. 131, at *4 (Dec. 8, 2011). The Board then "modif[ied] the [ALJ's] remedy to require that [Sheet Metal] withdraw its lawsuit against Donnelly in its entirety." *Id.* However, the Board reversed the ALJ's decision with respect to Sambe, finding that Sheet Metal's claim against Sambe, the general contractor, did not conflict with the section 10(k) award and therefore did not constitute an unfair labor practice. *Id.* at *2. Sheet Metal timely petitioned this Court for review of the Board's December 8, 2011 order, and the Board filed a cross-petition for enforcement.

## II. THE BOARD'S DECEMBER 8, 2011 DECISION AND ORDER

15

We have jurisdiction to review a decision and order of the Board pursuant to section 10 of the NLRA. *See* 29 U.S.C. §§ 160(e)-(f); *see also NLRB v. Cedar Tree Press, Inc.*, 169 F.3d 794, 795 (3d Cir. 1999). "We review [the Board's] factual findings to determine whether they are supported by substantial evidence on the record as a whole." *Local 30, United Slate, Tile & Composition Roofers v. NLRB*, 1 F.3d 1419, 1422 (3d Cir. 1993) ("*Gundle II*"). In doing so, we exercise care not to "displace the Board's factual inferences even if [we] would have reached a different conclusion on *de novo* review." *NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 121 (3d Cir. 1991). Although appellate review of legal questions raised in an NLRB decision and order is plenary, *Cedar Tree Press*, 169 F.3d at 795, the Board's interpretation of the Act is entitled to deference. *St. Margaret Mem'l Hosp. v. NLRB*, 991 F.2d 1146, 1151 (3d Cir. 1993). "We must enforce a Board order that rests upon an interpretation of the Act that is not 'an unreasonable or unprincipled construction of the statute . . . .'" *Gundle II*, 1 F.3d at 1422 (citing *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)).

Sheet Metal advances two theories in support of its argument that the Board's December 8, 2011 decision is unenforceable. First, Sheet Metal argues that the Board did not have jurisdiction to issue the December 31, 2007 section 10(k) order in which it found that Carpenters was entitled to the disputed work. Alternatively, Sheet Metal contends that even if the Board had jurisdiction to issue the December 31, 2007 decision and order, it erroneously concluded that Sheet Metal violated section 8(b)(4)(ii)(D) by pursuing the section 301 case after the section 10(k) order issued. We will address each argument in turn.

## A.

The Board has jurisdiction to resolve alleged violations of section 8(b)(4)(ii)(D) pursuant to section 10(k) of the NLRA, which provides:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [section 8(b)(4)(ii)(D)], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute.

*See* 29 U.S.C. § 160(k). To exercise jurisdiction pursuant to section 10(k), the Board must find "there is reasonable cause to believe that Section 8(b)(4)(D) of the Act has been violated." *See In re Int'l Alliance of Theatrical & Stage Employees*, 337 N.L.R.B. 721, 723 (2002). The Board conducts a three-step inquiry to determine whether this standard has been satisfied, examining whether there is

> reasonable cause to believe that
> (1) a union has used a proscribed

17

> means – such as picketing or threatening to picket – to enforce its claim to the work in dispute; (2) there are competing claims to the disputed work between rival groups of employees; and (3) there is no agreed-upon method for resolving the dispute voluntarily.

*Recon Refractory & Constr. Inc. v. NLRB*, 424 F.3d 980, 988 (9th Cir. 2005). Once the Board determines that these three requirements are met, it "will award the disputed work to one or the other of the vying unions, based on considerations such as the employer's past practice, industry custom, and contract rights." *Id.*

Only the third requirement is disputed here. Sheet Metal contends that the PLA dispute-resolution section provides the appropriate agreed-upon mechanism to resolve the work jurisdiction dispute.

"For the Board to find that the parties have agreed upon a method for the voluntary adjustment to a dispute, *all* parties must agree to be bound by the method." *Local 3-90, W. States Reg'l Council No. 3*, 261 N.L.R.B. 615, 617 (1982); *accord Int'l Union of Operating Eng'rs, Local 150*, 316 N.L.R.B. 360, 361 n.3 (1995) ("*Local 150*"). Where there exists an agreed-upon method for settlement of jurisdictional disputes, the Board will decline section 10(k) jurisdiction. *See William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville & Vicinity*, 417 U.S. 12, 18 (1974). The Board has explained that it does so to further Congress's preference,

as expressed through the NLRA, for voluntary resolution of labor disputes. *See id.* However, where no agreed-upon method exists, the Board will exercise jurisdiction pursuant to section 10(k) and resolve the work dispute itself. *See Local 150*, 316 N.L.R.B. at 361.

In its December 31, 2007 decision and order resolving Donnelly's unfair labor practice charge against Carpenters, the Board first determined that it had jurisdiction to resolve the work dispute between Donnelly, the employer, and Carpenters and Sheet Metal, the unions disputing the work assignment. *See Local Union No. 623*, 351 N.L.R.B. at 1419. The Board rejected Sheet Metal's argument that an agreed-upon method of dispute resolution existed because the PLA contained such a mechanism, reasoning that Carpenters was not a signatory to the PLA "and therefore is not bound to its dispute-resolution procedure" set forth in Article 10. *Id.* The Board thus concluded that "there [wa]s no agreed-upon voluntary method to adjust the dispute," and therefore the "dispute [was] properly before [it] for determination under Section 10(k)." *Id.*

It is undisputed that Carpenters was not a signatory to the PLA. Sheet Metal acknowledges as much, but argues that Carpenters was nonetheless bound by the PLA pursuant to N.J.S.A. § 52:38-4, which provides that "[a]ny [PLA] negotiated pursuant to this act . . . shall be binding on all contractors and subcontractors working on the public works project . . . ." Sheet Metal argues that Carpenters was also party to the PLA pursuant to the Entities Bound Clause found in Article 2, section 3, which provides that the PLA is binding on signatory unions and contractors, and "is further binding upon any employee of the owner, [General Contractor] or any

subcontractor performing work on the [Project] . . . ." (B. J.A. 100.)

Article 2, section 3 further provides, however, that in order for a subcontractor to be bound by the PLA, "[t]he Contractors shall include in any subcontract that they let, for performance during the term of this Agreement, *a requirement that their subcontractors, of whatever tier, become signatory* and bound by this Agreement . . . ." (B. J.A. 100) (emphasis added). As noted above, Carpenters did not sign the PLA, and the CBA between Carpenters and Donnelly did not obligate Carpenters to become a signatory to the PLA. On the contrary, the Carpenters/Donnelly CBA expressly provides that "[n]o project labor agreement (PLA) may supersede this agreement or any of its provisions or articles without the mutual consent of the parties," B. J.A. 33, and no evidence was offered showing that Carpenters consented to be bound by the PLA.

Sheet Metal's argument that Carpenters was bound by the PLA's Supremacy Clause is similarly unpersuasive. We agree with Sambe that the "Supremacy Clause merely harmonizes the PLA's provisions with the CBAs of the *signatory* Unions, displacing any contrary CBA provisions." (Sambe Combined Third Step Br. 21). Because Carpenters was not a signatory to the PLA – a fact that Sheet Metal does not dispute – the Supremacy Clause does not apply to Carpenters' CBA and cannot, as Sambe urges, trump the CBA between Donnelly and Carpenters and displace the dispute resolution mechanism contained therein.[14]

---

[14] Alternatively, Sheet Metal argues that Carpenters was bound by the PLA under the doctrine of equitable

Furthermore, the case law Sheet Metal cites in support of its position that an agreed-upon dispute resolution mechanism existed actually counsels in favor of reaching the *opposite* conclusion. For example, in *Sw. Reg'l Council of Carpenters*, 348 N.L.R.B. 1250 (2006), the Board found that, notwithstanding the existence of a governing project service agreement containing a dispute resolution mechanism, there was no agreed-upon method because "the record show[ed] that there [were] potentially conflicting forums for resolving the disputes" among the parties. *Id.* at 1254. The Board expressly stated that it was "unnecessary to resolve whether all the parties" were actually bound by the labor agreement in question because the fact that the parties disputed whether they were bound by the agreement *alone* satisfied the third jurisdictional requirement for exercising section 10(k) jurisdiction. *Id.* Similarly, in *Int'l Bhd. of Electrical Workers, Local Union No. 363*, 326 N.L.R.B. 1382 (1998), the Board found that no agreed-upon voluntary dispute resolution mechanism existed where the aggrieved union was a signatory to a PLA which "contain[ed] a specific provision outlining a procedure for dealing with jurisdictional work disputes," but the other parties to the 10(k) proceeding – the employer who made the disputed work assignment and the union that received the disputed work –were not signatories. *Id.* at 1384. The Board thus concluded that it could properly

estoppel. However, we do not have jurisdiction to consider this argument because Sheet Metal never raised it before the Board and fails to point to any "extraordinary circumstances" justifying its failure to do so. 29 U.S.C. § 160(e).

exercise jurisdiction pursuant to section 10(k).[15]  *See id.* Indeed, where, as here, an employer has bound itself to conflicting labor agreements, "the Board has held that no *determinative* agreed-on method exists for resolving the dispute," and thus section 10(k)'s third jurisdictional requirement is satisfied.  *Int'l Union of Operating Eng'rs, Local 318*, 322 N.L.R.B. 709, 712 (1996).

Affording "due deference to the Board's expertise in drawing factual inferences," *Gundle II*, 1 F.3d at 1425, we hold that the Board's finding that there existed no agreed-upon voluntary dispute resolution mechanism is supported by substantial record evidence and is thus "conclusive."  29 U.S.C. § 160(e); *see also Int'l Union of Operating Eng'rs, Local No. 714 v. Sullivan Transfer, Inc.*, 650 F.2d 669, 679 (5th Cir. 1981).  Accordingly, the Board's determination that all three requirements for exercising jurisdiction pursuant to section 10(k) were satisfied had a "reasonable basis in law" and will not be disturbed on appellate review.  *See Ford*

---

[15]  The remaining cases relied upon by Sheet Metal in support of this argument are inapposite.  *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257 (6th Cir. 1996), involved an appeal from a district court's grant of summary judgment, not a decision by the Board in which it determined that it had section 10(k) jurisdiction.  *Id.* at 259.  And in *Laborers Int'l Union of N. Am., Local No. 320*, 318 N.L.R.B. 917 (1995), the parties stipulated that there was no agreed-upon method for voluntary dispute resolution and thus the Board was not called upon to determine whether the third requirement for section 10(k) jurisdiction was satisfied.  *Id.* at 918.

22

*Motor Co.*, 441 U.S. at 497 (citation omitted) (internal quotation marks omitted).  The Board properly exercised jurisdiction pursuant to section 10(k) when it issued the December 31, 2007 order awarding the disputed work to Carpenters.  Accordingly, Sheet Metal's contention that it could not properly have been found to violate section 8(b)(4)(ii)(D) because the Board lacked the authority to issue its work assignment order is without merit.  The Board's petition to enforce the December 8, 2011 order cannot be denied on that ground.

## B.

Sheet Metal argues in the alternative that even if the Board had jurisdiction to issue the section 10(k) award, it erred in concluding that Sheet Metal violated section 8(b)(4)(ii)(D) by maintaining the section 301 suit against Donnelly after December 31, 2007, the date of the Board's section 10(k) determination awarding the disputed work to Carpenters.[16]  *See Sheet Metal*, 357 N.L.R.B. No. 131, at *3.

---

[16] As the Board correctly pointed out, Sheet Metal's section 301 suit became an unfair labor practice only *after* the December 31, 2007 section 10(k) decision issued.  *See Sheet Metal*, 357 N.L.R.B. No. 131, at *5; *see also Local Union No. 7, ILWU*, 291 N.L.R.B. 89, 92 (1988).  Common sense establishes that Sheet Metal's section 301 suit could not be found to conflict with a prior order of the Board, and thus could not be "coerc[ive]" within the meaning of section 8(b)(4)(ii)(D), until the Board actually issued an order with which the suit could conflict.

In holding that Sheet Metal committed an unfair labor practice, the Board reasoned:

> It is well established that a union's lawsuit to obtain work awarded by the Board under Section 10(k) to a different group of employees, or monetary damages in lieu of the work, has an illegal objective for purposes of *Bill Johnson's* [*Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983)] footnote 5 and violates Section 8(b)(4)(ii)(D). Accordingly, we affirm the [ALJ's] finding that, following the Board's 10(k) award, [Sheet Metal's] maintenance of its 301 lawsuit was incompatible with the Board's award and, therefore, had an objective that was illegal under Federal law.

*Id.* The Board rejected Sheet Metal's argument that the suit was permissible because it sought "damages only for breach of the PLA, not pay-in-lieu of assignment of the work." *Id.* The Board explained that the effect of Sheet Metal's request for damages, rather than the disputed work itself, was "the same as the first amended complaint's request that Donnelly pay damages for assigning the work to employees represented by [Carpenters]," and thus Sheet Metal's attempt to distinguish its suit from one for pay-in-lieu of work was a "distinction without a difference." *Id.* The Board also

24

reversed the ALJ's finding that Sheet Metal was entitled to a declaratory judgment validating the Aiges arbitration award, because, "[i]f granted, a declaration validating the finding that Donnelly breached the PLA by assigning the work to the Carpenters-represented employees would also directly conflict with the 10(k) award." *Id.* at *4. The Board thus ordered Sheet Metal to "withdraw its lawsuit against Donnelly in its entirety."[17] *Id.* "We review to determine

---

[17] The Board reversed the ALJ's decision with respect to Sambe, finding, contrary to the ALJ's determination, that Sheet Metal's pursuit of a breach of contract claim against Sambe did not constitute an unfair labor practice. *See Sheet Metal*, 357 N.L.R.B. No. 131, at *2. The Board explained that "because Sambe did not assign the disputed work directly to employees, an award against Sambe would not be inconsistent with the Board's 10(k) award." *Id.*

Sambe does not petition for review of this portion of the Board's decision, and in fact acknowledges that the Board's section 10(k) order "does not *automatically* bar [Sheet Metal's] breach of contract claim against Sambe – because it was Donnelly and not Sambe that assigned the disputed work . . . ." (Sambe Combined Third Step Br. 2.) Sambe also acknowledges that a suit for contract damages can be maintained against general contractors even after the Board issues a section 10(k) award assigning the disputed work to another union, but argues that this "exception" does not apply here, and thus the District Court erred in granting summary judgment for Sheet Metal on its breach of contract claim against Sambe. (Sambe Combined Third Step Br. 33.) We address this argument in Part III(B) *infra*, in our

25

whether the Board's finding rests on a reasonable interpretation of the Act." *Gundle II*, 1 F.3d at 1426.

Section 301 of the LMRA authorizes "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations . . . ." 29 U.S.C. § 185(a). A section 301 lawsuit may be enjoined as an unfair labor practice pursuant to section 8(b)(4)(ii)(D) in certain circumstances. In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983), the Supreme Court outlined a two-prong test for determining whether a lawsuit constitutes an unfair labor practice in violation of section 8(b)(4)(ii)(D). *See id.* at 744. Under the *Bill Johnson's* "improper motivation" test, "before a civil suit can be enjoined, both an improper motivation and a lack of reasonable legal basis for the suit must be demonstrated." *Hoeber v. Local 30, United Slate Tile & Composition Roofers*, 939 F.2d 118, 122 (3d Cir. 1991) ("*Gundle I*"); *see Bill Johnson's*, 461 U.S. at 744. The *Bill Johnson's* Court recognized that an exception exists, however, where the lawsuit "has an objective that is illegal under federal law."[18] 461 U.S. at 737 n.5.

---

discussion of the parties' appeals from the District Court's orders.

[18] Although the Supreme Court's statement in footnote 5 of *Bill Johnson's* is technically dictum, we have explained that the Court's "*dicta* are highly persuasive" and are not to be viewed lightly. *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007); *see also In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000). Moreover, as discussed *infra*, the "illegal objective" exception articulated

We have observed that "[s]ince [*Bill Johnson's*], other courts of appeals and the Board have agreed that pursuit of a section 301 breach of contract suit that directly conflicts with a section 10(k) determination has an illegal objective and is enjoinable as an unfair labor practice under section 8(b)(4)(ii)(D)." *Gundle II*, 1 F.3d at 1426. We joined those other Courts of Appeals in the *Gundle* trilogy of cases. *See Gundle I*; *Gundle II*, 1 F.3d at 1427-29; *United Union of Roofers, Local Union No. 30 v. Gundle Lining Constr. Corp.*, 1 F.3d 1429 (3d Cir. 1993) ("*Gundle III*"). We revisit the issue now to clarify our jurisprudence.

The *Gundle* cases, as here, involved a work dispute between an employer, Gundle Lining Construction Corporation, and two unions, Local 30 and Local 172. *See Gundle I*, 939 F.2d at 119. Gundle had a contract to perform liner installation work at a New Jersey county landfill and subcontracted the work to Local 30 via a "Memorandum Agreement" in which it also became a party to Local 30's CBA. *Id.* at 119-120. After the project was completed, Gundle began another project at the landfill, for which it hired Local 172, rather than Local 30, to perform the lining work. *See id.* at 120. "Local 30 took the position that this work was covered by the Memorandum Agreement, and therefore that Gundle was contractually bound to hire Local 30's workers." *Id.* When work began on the second project, Local 30 employees picketed the worksite. *Id.*

in footnote five has achieved the status of law in the majority of the Courts of Appeals.

In response, Gundle filed an unfair labor practice charge against Local 30, alleging that the union violated section 8(b)(4)(ii)(D) of the NLRA by picketing the worksite. *Id.* Local 30, in turn, filed a grievance with the Joint Conference Board ("JCB") pursuant to its CBA, alleging that Gundle breached the Memorandum Agreement by hiring Local 172 for the second landfill project. *Id.* In January, 1990, the JCB issued an award in Local 30's favor, finding that Gundle violated the Memorandum Agreement and was required to compensate Local 30 employees. *Id.* Local 30 subsequently filed a section 301 lawsuit seeking to enforce the JCB's arbitration award. *Id.* In June, 1990, the NLRB "issued its 10(k) decision, awarding the disputed work to Local 172." *Id.* Local 30 continued to pursue its section 301 suit, and the NLRB petitioned under section 10(l) of the NLRA, 29 U.S.C. § 160(l), to temporarily enjoin the suit until the NLRB issued its decision resolving Gundle's unfair labor practice charge. *See id.* at 121. The District Court denied the petition for injunctive relief, and the NLRB appealed. *See id.* at 122.

We reviewed the Board's appeal in *Gundle I*, where we ultimately affirmed the District Court's denial of the Board's petition for an injunction. *See id.* at 128. In so holding, we explained that "[i]n a § 10(l) injunction proceeding, our standard of review involves three separate determinations – determinations that the district court must make before it may issue a § 10(l) injunction." *Id.* at 123. First, we reviewed *de novo* "the district court's determination as to whether there [was] a substantial legal theory explicit or implicit in the case that would support a finding that an unfair labor practice had occurred." *Id.* (internal quotation marks deleted). We concluded that the Board's theory that "the

28

filing and prosecution of Local 30's lawsuit is inherently coercive, because it brings pressure to bear on Gundle to reassign its linear installation work from Local 172 to Local 30" was "on its face" sufficient to establish "a substantial and nonfrivolous legal theory on the basis of which Local 30's § 301 enforcement lawsuit could possibly constitute an unfair labor practice." *Id.* at 123-24.

Having found that a substantial legal theory existed, we then "appl[ied] a deferential standard of review" to the District Court's determination that the second requirement for injunctive relief – a showing that the facts of the case fit the Board's legal theory – was not satisfied. *Id.* at 123. We concluded that the District Court did not clearly err in finding the Board "failed to demonstrate that the facts of th[e] case fit within [its] theory" that Local 30 was acting to coerce Gundle into reassigning the disputed work through its section 301 suit and thus the suit was not enjoinable under the *Bill Johnson's* "improper motivation" test. *Id.* at 124, 128. We explained:

> [I]f we were to hold that Local 30's lawsuit necessarily constitutes improper coercion, we would be creating a rule under which an employer could unilaterally avoid a union contract . . . Such a result does not reflect the intent of Congress in creating the mechanism of the 10(l) injunction, and we will not permit § 10(l) to be abused in such a manner. There may well be circumstances – such as those

29

> described by the Supreme Court in *Bill Johnson's* – in which a lawsuit is used improperly or coercively. This is not such a case, however, and the district court's findings of fact on this issue are not clearly erroneous.

*See id.* at 125.

Finally, we reviewed the third factor that is considered in determining whether to grant injunctive relief pursuant to section 10(l): the District Court's "discretionary decision" to grant injunctive relief upon finding that it is "the just and proper remedy." *Id.* at 123, 125 (internal quotation marks omitted). Reviewing for abuse of discretion, we concluded that "there [were] at least three reasons why the [District Court's] denial of injunctive relief was proper." *Id.* at 126.

> First, the Congressional purpose behind the enactment of § 10(l) was not to enjoin legal action, but was rather to enjoin clear obstacles and impediments to business, such as strikes, pickets, and boycotts. . . . Therefore, the district court, in focusing on the large objectives of the Act, correctly held that prosecution of Local 30's suit did not create the degree of harm necessary to justify an injunction. . . . [Second,] [i]njunctive relief under

30

10(l) is only a temporary measure. . . . Since Gundle would still risk a later revival of the lawsuit, any incentive that Gundle presently has to reassign the work to Local 30 so as to avoid double liability would continue even if the injunction issued. . . . Third, the substantive arguments that the NLRB and Gundle raise before us could all have been raised as a defense in Local 30's § 301 suit which seeks to enforce the [JCB's] decision in favor of Local 30. . . . An injunction is thus not the only means by which the Board could achieve its objective – and indeed . . . injunctions against the prosecution of a lawsuit are a highly disfavored remedy.

*Id.* at 126-27 (internal quotation marks and citations deleted). We thus declined in *Gundle I* to disturb the District Court's denial of injunctive relief. *Id.* at 128.

On July 20, 1992, the NLRB rendered its decision on Gundle's unfair labor practice charge, holding that Local 30 committed unfair labor practices in violation of section 8(b)(4)(ii)(D) "by picketing and maintaining its section 301 suit" after the Board's section 10(k) order issued, and further ordering Local 30 to withdraw the suit. *See Gundle II*, 1 F.3d at 1422. Local 30 petitioned for review, and the Board cross-

31

petitioned for enforcement.  *See id.* at 1420.  We reviewed these petitions in *Gundle II*, where we explained that the "[t]he crux of the issue . . . [was] whether the arbitration award for Local 30 is inconsistent with or contrary to the Board's assignment of the work to Local 172" such that Local 30's suit to enforce the award constituted an unfair labor practice under *Bill Johnson's* "illegal objective" exception.  *Id.* at 1427.

We answered this question in the affirmative and expressly rejected Local 30's argument that its section 301 suit was not contrary to the Board's section 10(k) decision because the suit did not seek the disputed work, but instead sought to enforce an arbitration award for pay-in-lieu of work damages.  *See id.*  In so holding, we explained that "[t]he distinction Local 30 seeks to draw between seeking the work and seeking payment for the work is ephemeral."  *Id.*  We relied on our rationale in *NLRB v. Local 1291, Int'l Longshoremen's Ass'n*, 368 F.2d 107 (3d Cir. 1966), *cert. denied*, 386 U.S. 1033 (1967), that

> the valuable part of a right to a particular job is the right to be paid for it.  Thus, a jurisdictional dispute between two groups of employees as to which is entitled to certain work is in essence a dispute as to which shall receive compensation for that work.  *The opportunity sought to perform labor is significant only as a means of obtaining compensation.*  It follows that if workmen, who

> are entitled to a job under the
> terms of the labor contract, agree
> to forego the obligation of
> working but not the concomitant
> right to payment, they have not
> disclaimed any significant right.

*Gundle II*, 1 F.3d at 1427-28 (quoting *Local 1291*, 368 F.2d at 110). We emphasized that making a distinction between seeking the work from seeking damages for not receiving the work would be inconsistent with *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261 (1964). There, the Supreme Court held that a Board's ruling "take[s] precedence" over a conflicting arbitration award. *Gundle II*, 1 F.3d at 1428 (quoting *Carey*, 375 U.S. at 272). Finding that Local 30's section 301 suit conflicted with the Board's prior section 10(k) award because it sought to enforce an arbitration award "to recover damages for work awarded to another union," we thus upheld "the Board's interpretation of the Act to treat maintenance of the section 301 lawsuit to enforce an arbitration award against Gundle for pay-in-lieu of work as an unfair labor practice." *Id.* at 1428-29.

Sheet Metal acknowledges that the majority of Courts of Appeals, including our Court, have held that "'there is no material difference between seeking work and seeking payment in lieu of work.'"[19] (Sheet Metal B. Br. 36) (quoting

---

[19] Since our decisions in the *Gundle* cases, the majority of our sister Courts of Appeals have likewise held that a section 301 suit for damages or to enforce an arbitrator's award of pay-in-lieu of work constitutes an unfair labor practice where the suit directly conflicts with a section

33

*Gundle II*, 1 F.3d at 1427-28).  But according to Sheet Metal, *Gundle II* is not controlling because it does not involve a PLA and is "inconsistent" with *Gundle I*.  (Sheet Metal B. Br. 37.) Sheet Metal thus urges this Court to hold that a section 301

---

10(k) determination by the Board.  *See, e.g.*, *T. Equip. Corp. v. Mass. Laborers' Dist. Council*, 166 F.3d 11, 19 (1st Cir. 1999) ("We agree with the Third Circuit that there can be no logical distinction between 'seeking the work and seeking payment for the work.'") (citing *Gundle II*, 1 F.3d at 1427); *ILWU v. N.L.R.B.*, 884 F.2d 1407, 1414 (D.C. Cir. 1989) ("[I]f petitioners were entitled to assert contract claims against [a union the Board deemed entitled to disputed work in a section 10(k) proceeding], in contravention of the Board's section 10(k) award, the very purpose of section 10(k) – to authorize the Board to resolve the jurisdictional dispute – would be totally frustrated . . . [W]hatever [a] union's motivation and no matter how persuasive its contractual case, a union cannot force an employer to choose between a Board section 10(k) award and a squarely contrary contract claim."); *see also Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 492-93 (9th Cir. 2010); *UAW & its Local 1519 v. Rockwell Int'l Corp.*, 619 F.2d 580, 585 (6th Cir. 1980).  The Board, "whose construction of the Act is entitled to deference," *Gundle II*, 1 F.3d at 1428, has similarly held that a section 301 suit that conflicts with a section 10(k) order constitutes an unfair labor practice under the NLRA.  *See, e.g.*, *Sheet Metal*, 357 N.L.R.B. No. 131, at *3; *ILWU, Local 13*, 290 N.L.R.B. 616, 616-17 (1988), *enf'd* 884 F.3d at 1413-14; *Local 32, ILWU*, 271 N.L.R.B. 759, 763 (1984), *enf'd sub nom. ILWU, Local 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012 (9th Cir. 1985), *cert. denied* 476 U.S. 1158 (1986).

suit for breach of contract damages is permissible, even in the face of a conflicting section 10(k) award by the Board, where it seeks merely damages, not the disputed work itself. The Board, for its part, argues that Sheet Metal's position "is premised on a theory squarely rejected by this Court[] . . . in *Gundle [II]*." (Board Br. 21.) The Board concludes that, under *Gundle II* and the Board's own precedent, it "reasonably found that [Sheet Metal's] lawsuit, seeking pay for work that the Board awarded to the Carpenters, is incompatible with the Section 10(k) Determination, and therefore has an objective that is illegal under federal law." (Board Br. 20) (citation omitted) (internal quotation marks omitted).

We agree with the Board that *Gundle II* controls the disposition of this appeal. *Gundle II* is not, as Sheet Metal suggests, "inconsistent" with *Gundle I* merely because in the latter we stated in dicta that "'we cannot agree with the NLRB that seeking enforcement of an arbitral award based on a breach of contract to assign work is identical to seeking the disputed work itself.'" (Sheet Metal B. Br. 37) (quoting *Gundle I*, 939 F.2d at 124 n.10). We made this statement in the context of reviewing the District Court's conclusion that the Board failed to satisfy second requirement for obtaining injunctive relief, i.e., demonstrating that the facts of the case supported the Board's articulated legal theory that Local 30's section 301 suit had an improper motivation and thus constituted an unfair labor practice. *See Gundle I*, 939 F.2d at 124. In this procedural posture, we were required to "uphold the district court's finding that Local 30's § 301 suit was *not* improperly motivated unless that finding [was] clearly erroneous." *Id.* at 125. In *Gundle II*, on the other hand, we were required to defer to "the Board's interpretation of the

35

Act to treat maintenance of the section 301 lawsuit to enforce an arbitration award against Gundle for pay-in-lieu of work as an unfair labor practice" so long as that interpretation was reasonable. *See* 1 F.3d at 1429. Thus, our seemingly inconsistent statements in *Gundle I* and *Gundle II* as to the propriety of section 301 suits for breach of contract damages in the face of a conflicting 10(k) award are explained, in part, by the highly deferential standards of review we appropriately applied in each case, standards which required us to defer to the differing conclusions of the District Court and Board, respectively.

Moreover, as we pointed out in *Gundle II*, the statements in *Gundle I* concerning why Local 30's section 301 suit for breach of contract damages did not satisfy the *Bill Johnson's* "improper motivation" test are "not controlling" in cases such as *Gundle II*, where a party seeks to enjoin a section 301 suit under the "illegal objective" exception. *Id.* at 1429 n.13. The "improper motivation" and "illegal objective" tests require different showings in order to establish that the suit in question is enjoinable pursuant to section 8(b)(4)(ii)(D), and thus the *Gundle I* Court's statements concerning whether a section 301 suit for breach of contract damages satisfies the "improper motivation" test are not dispositive in determining whether the same suit may alternatively be enjoined under the "illegal objective" exception.[20] *See Bill Johnson's*, 461 U.S. at 737 n.5, 744.

_____

[20] The *Gundle I* Court never considered whether Local 30's suit could have been enjoined under the "illegal objective" exception, nor should it have, for our charge in that case was solely to review the propriety of the District Court's decision to deny the Board's petition for an injunction. As

36

Furthermore, because "a section 10(l) proceeding is independent of the proceeding on the merits," any "speculation" we expressed in *Gundle I* concerning Local 30's ability to obtain contract damages against Gundle in the face of a contrary 10(k) decision by the Board "is not binding on us in the context of an appeal on the merits."[21] *Gundle II*, 1 F.3d at 1425 n.9. Indeed, although in *Gundle I* we

---

discussed *supra*, the District Court concluded that the second requirement for injunctive relief was not satisfied because the Board failed to show that the facts of the case satisfied the legal theory that the suit was enjoinable under the "improper motivation" test proffered by the Board. *See Gundle I*, 939 F.2d at 124-25. The *Gundle I* Court was only called upon to consider the "improper motivation" test and, except upon a finding of clear error, was required to defer to the District Court's conclusion that the facts of the case did not fit that legal theory. *See id.* at 123.

[21] Sheet Metal also attempts to distinguish *Gundle II* on the ground that the section 301 suit at issue in that case was premised upon an alleged breach of Local 30's CBA, whereas Sheet Metal's section 301 suit, in contrast, is predicated upon a purported breach of the PLA. However, the PLA is a *type* of CBA, and thus we cannot agree that *Gundle II* is distinguishable simply because it involved a CBA rather than a PLA. *See* N.J.S.A. § 52:38-2 ("'Project labor agreement' means a form of pre-hire collective bargaining agreement covering terms and conditions of a specific project."); *see also Phoenix Eng'g, Inc. v. MK-Ferguson of Oak Ridge Co.*, 966 F.2d 1513, 1518 (6th Cir. 1992).

expressed doubt about the propriety of a section 301 suit to enforce an arbitration award where the Board has issued a section 10(k) order, we expressly left open the question of whether an arbitration award that conflicts with a 10(k) order of the Board is an unfair labor practice pursuant to section 8(b)(4)(ii)(D). *See Gundle I*, 939 F.2d at 124 n.10 ("We express no opinion, of course, on the merits of Local 30's enforcement action."). We answered this question in the affirmative in *Gundle II*, where, considering the merits of Local 30's section 301 suit to enforce the arbitration award, we held in no uncertain terms that a section 301 suit for breach of contract damages *is* identical to seeking the disputed work and is thus "coercive" for the purposes of section 8(b)(4)(ii)(D). *See Gundle II*, 1 F.3d at 1427-29. Thus, it is our more recent holding in *Gundle II*, rather than our earlier dicta in *Gundle I*, that controls. *See ACLU of N.J. ex rel. Lander v. Schundler*, 168 F.3d 92, 98 n.6 (3d Cir. 1999) ("[I]t is the tradition of this court that *the holding* of a panel in a reported opinion is binding on subsequent panels . . . [W]e have repeatedly held that dicta are not binding.") (citation omitted) (internal quotation marks omitted).

Twenty years ago, we warned that "if a union is permitted to recover damages for work awarded to another union in a section 10(k) proceeding, the policy underlying section 8(b)(4)(ii)(D) of protecting employers from the detrimental impact of jurisdictional disputes would be severely undermined." *Gundle II*, 1 F.3d at 1428. As the Supreme Court explained in *Carey*, the section 10(k) grievance procedure furthers the policies of the Act and effectuates Congress's intent in enacting the NLRA to "actively encourage[] voluntary settlements of work assignment controversies between unions." *See* 375 U.S. at

38

266. These policy concerns, which motivated our decision in *Gundle II*, are equally persuasive today. Heeding the principles of stare decisis that guide our jurisprudence, we thus hold, in accordance with our two decade-old precedent, that the Board's interpretation of the Act at issue here – treating the pursuit of a lawsuit for pay-in-lieu of work in the face of a contrary work assignment order of the Board as an unfair labor practice – is a reasonable one. *See Morrow v. Balaski*, 719 F.3d 160, 182 (3d Cir. 2013) (en banc) (Smith, J., concurring) ("Absent . . . exceptional intervening developments, the essence of stare decisis is that the mere existence of [our precedent] becomes a reason for adhering to [its] holding[] in subsequent cases.") (citation omitted) (internal quotation marks omitted).

We take this opportunity to clarify, however, that our holding applies to suits for damages against *the employer that made the disputed work assignment* and thus becomes subject to the conflicting demands of section 301 suit for damages, on one hand, and the Board's 10(k) order, on the other. Since our decision in *Gundle II*, the Board and other Courts of Appeals have so distinguished between suits for contract damages against contractors not responsible for making the disputed work assignment and suits against the assigning employer, declining to extend our holding in *Gundle II* to prohibit suits against the non-assigning contractors. *See, e.g.*, *Local Union 33, United Bhd. of Carpenters & Joiners of Am.*, 289 N.L.R.B. 1482, 1484 (1988); *Miron Constr. Co., Inc. v. Int'l Union of Operating Eng'rs, Local 139*, 44 F.3d 558, 565-67 (7th Cir. 1995). We are persuaded by their reasoning. As the Seventh Circuit explained in *Miron*,

a union's mere pursuit of its contractual remedies against the general contractor, absent a demand that the subcontractor reassign the work, does not amount to coercion in contravention of the § 10(k) award. Since the subcontractor has complete control over which union actually performs the work, maintenance of an action against the general contractor cannot be viewed as a veiled attempt to force a reassignment of the work. The element of coercion is what distinguishes [a suit against a general contractor] from [that at issue in *Gundle II*].

44 F.3d at 566; *see also Advance Cast Stone Co. v. Bridge, Structural & Reinforcing Iron Workers, Local Union No. 1*, 376 F.3d 734, 742 (7th Cir. 2004) (explaining that a suit against the contractor who did not make the disputed work assignment "[does] not implicate the general principle that the NLRB's § 10(k) determination takes precedence over an arbitrator's award").

We therefore conclude that the Board's interpretation of the Act as prohibiting maintenance of Sheet Metal's section 301 lawsuit to seek contract damages and enforce the Aiges arbitration award against Donnelly was not erroneous as a matter of law. *See Gundle II*, 1 F.3d at 1429.

Accordingly, we will deny Sheet Metal's petition for review and grant the Board's cross-petition for enforcement.

## III. THE DISTRICT COURT'S ORDERS

Finally, we turn to the parties' appeals from the District Court's orders denying Sambe's and Donnelly's motions to vacate the Aiges arbitration award, and granting summary judgment in favor of Sheet Metal on its breach of contract claims against Sambe and Donnelly. The District Court had jurisdiction under section 301 of the LMRA, 29 U.S.C. § 185(a), and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

### A.

Sambe and Donnelly first moved to vacate the Aiges arbitration award pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, in October, 2007. After the Board issued its section 10(k) order granting the disputed work to Carpenters, Donnelly filed a supplement to its cross-motion to vacate, arguing that the section 10(k) decision precluded the District Court from granting Sheet Metal's request to enforce the Aiges award and seeking vacatur of the award. On March 27, 2008, the District Court denied the motions to vacate because "it disagree[d] with the implied end of Donnelly's position – that there is no monetary remedy for [Sheet Metal] even if the PLA is valid and [Sambe and Donnelly] breached that contract." (D.C. J.A. 21.) We exercise de novo review over a district court's denial of a motion to vacate an arbitration award. *See Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).

41

We agree with Sambe and Donnelly that the District Court erred when it refused to vacate the Aiges award. It is well-established that where an arbitration award squarely conflicts with a later Board ruling, the arbitration award must yield to the Board's decision. This principle derives from the Supreme Court's decision in *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261 (1964), where the Court stated in dicta that "[s]hould the Board disagree with [an] arbiter . . . the Board's ruling would, of course, take precedence," because "[t]he superior authority of the Board may be invoked at any time." *Id.* at 272. Relying upon the Supreme Court's dicta in *Carey*, the majority of the Courts of Appeals have since held that a section 10(k) award nullifies a contrary arbitration award. *See, e.g.*, *Pac. Mar. Ass'n*, 773 F.2d at 1021 ("The policies underlying the supremacy doctrine, as enunciated by the Supreme Court in *Carey* and the overwhelming body of circuit and district court decisions, indicate that a section 10(k) decision must be given precedence over an arbitrator's contrary decision."); *see also Teamsters Union Local No. 115 v. DeSoto, Inc.*, 725 F.2d 931, 936 (3d Cir. 1984); *Local 1519*, 619 F.2d at 583; *Local 7-210, Oil, Chemical & Atomic Workers v. Union Tank Car Co.*, 475 F.2d 194, 199 (7th Cir. 1973); *New Orleans Typographical Union No. 17 v. NLRB*, 368 F.2d 755, 767 (5th Cir. 1966). The appropriate remedy, then, is to vacate the conflicting arbitration award. *See T. Equip. Corp.*, 166 F.3d at 19; *see also Pac. Mar. Ass'n*, 773 F.2d at 1020.

The Aiges arbitration award squarely conflicted with the Board's section 10(k) decision by holding, contrary to the section 10(k) order, that Sheet Metal was entitled to the disputed work and by directing that the work be reassigned "to members of Sheet Metal Workers Local 27." (D.C. J.A.

42

296.) Thus, the District Court was required as a matter of law to vacate the Aiges award and erred by declining to do so. Accordingly, we will vacate the District Court's order of March 27, 2008 and remand with directions to vacate the Aiges arbitration award.

B.

We turn next to Donnelly's, Sambe's, and Sheet Metal's respective appeals from the District Court's orders granting summary judgment in favor of Sheet Metal. We review the District Court's grant of summary judgment *de novo*, "applying the same standard as the District Court." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). "This requires that we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Id.* Summary judgment is proper where no genuine dispute exists as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

1.

As to Donnelly's appeal, affirmance of the Board's decision and order of December 8, 2011, compels reversal of the District Court's entry of judgment in favor of Sheet Metal. As we explained in *Gundle III*, it follows from our decision to enforce an order of the Board finding that a union committed an unfair labor practice by maintaining a section 301 suit that directly conflicts with a section 10(k) award that the union "is prohibited from the continued maintenance of [its] section 301 suit." 1 F.3d at 1430. Accordingly, we will vacate the orders of the District Court granting summary judgment in

43

favor of Sheet Metal and finding Donnelly liable for breach of contract damages in the amount of $365,349.75, and remand with directions to enter judgment in favor or Donnelly. *See id.*; *see also New Orleans Typographical Union No. 17*, 368 F.2d at 768.

2.

Finally, we turn to Sambe's and Sheet Metal's appeals from the District Court's orders granting summary judgment in favor of Sheet Metal on its breach of contract claim and awarding Sheet Metal nominal damages of $1.00. To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages.[22] *See Coyle v. Englander's*, 488 A.2d 1083, 1088 (N.J. Super. Ct. App. Div. 1985). The Supreme Court of New Jersey has instructed that "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written." *Kutzin v. Pirnie*, 591 A.2d 933, 936 (1991) (citation omitted) (internal quotation marks omitted); *accord Tamarind Resort Assocs. v. Gov't of V.I.*, 138 F.3d 107, 110-11 (3d Cir. 1998) ("We have consistently embraced the basic common law principle that a contract is unambiguous if it is reasonably capable of only one construction."). "We therefore will affirm a grant of summary judgment in a breach of contract action only where the contract is unambiguous and the

---

[22] There is no dispute that New Jersey law governs the contract claims herein.

44

moving party is entitled to judgment as a matter of law." *Tamarind Resort Assocs.*, 138 F.3d at 111.

In reviewing Sheet Metal's motion for summary judgment, the District Court determined that only the first two elements of the breach of contract claim were at issue because it was "undisputed that [Sheet Metal] suffered damages from the assignment of the roofing work to another union." *Sheet Metal I*, 673 F. Supp. 2d at 319. The District Court held that the second element was satisfied as a matter of law because the Aiges award finding that Sambe violated the PLA by assigning the work to Carpenters was entitled to preclusive effect, and thus the District Court was bound by that conclusion. *Id.* at 322. The District Court rejected Sambe's argument that the Aiges award was not enforceable because it conflicted with the Board's 10(k) determination. *See id.* at 320 n.10.

The District Court alternatively held that, even if the Aiges award did not have preclusive effect, "the undisputed evidence demonstrates" that Sambe breached the PLA by failing to assure that Donnelly complied with the Agreement, as required by Article 3, Section 1.[23] *Id.* at 322 n.16. The

---

[23] Article 3, section 1 provides in pertinent part:

> [T]he General Contractor shall require all Contractors of whatever tier who have been awarded contracts for the work covered by this Agreement, to accept and be bound by the terms and conditions of this Project

45

District Court determined, without further explanation, that "[a]lthough Sambe argues that it discharged its contractual duty by requiring Donnelly to execute the Letter of Assent, the PLA clearly required Sambe to 'assure [Donnelly's] compliance,' which, it is undisputed, it did not do." *Id.* The District Court thus concluded that "there is no genuine issue of material fact as to whether Sambe . . . failed to perform [its] PLA obligations," and Sambe was liable for breach of contract as a matter of law. *Id.*

Sambe challenges the District Court's conclusion that the Aiges award was entitled to preclusive effect and thus the second element of Sheet Metal's breach of contract claim was satisfied as a matter of law. According to Sambe, the Aiges award should not have been given preclusive effect because it conflicted with the Board's section 10(k) order, and therefore it should have been vacated and could not have formed the basis for Sambe's breach of contract liability. We agree. For the reasons discussed in parts II(B) and III(A) *supra*, the District Court was required to vacate the Aiges arbitration award following the Board's section 10(k) decision, and committed reversible error by failing to do so.

---

Agreement by executing the Letter of Assent (Attachment A) prior to commencing work. The General Contractor shall assure compliance with this Agreement by the Contractors.

(B. J.A. 103.)

46

It does not follow, however, that Sambe is absolved of contract liability under *Gundle II*. Sambe acknowledges that *Gundle II* does not apply to Sheet Metal's suit against Sambe "in the same manner respecting Donnelly," but urges this Court to apply *Gundle II* to find that Sheet Metal was prohibited from continuing its section 301 suit against both Donnelly *and* Sambe. (Sambe Combined Third Step Br. 33.)

We will not do so. As we explained in part II(B) *supra*, there is a distinction between a breach of contract suit against the assigning employer and one against an employer with no authority to assign the disputed work. Contrary to Sambe's suggestion, this is a distinction *with* "relevance" and one that has *significant* "bearing upon the facts of the instant matter." (Sambe Combined Third Step Br. 35.) As the general contractor on the Project, with no power to make or amend the disputed work assignment, Sambe was not subject to the "conflicting demands" of an order by the Board, on the one hand, or complying with an arbitration order contrary to a decision of the Board, on the other. *See Local 33*, 289 N.L.R.B. at 1483. Thus, we cannot agree with Sambe that the District Court erred by refusing to find that Sheet Metal was prohibited from continuing its section 301 suit against Sambe after the Board's 10(k) decision issued.

We do find, however, that the District Court erred in its alternative holding that even if the Aiges award did not have preclusive effect, summary judgment was warranted because there was "no genuine issue of material fact as to whether Sambe" failed to satisfy its obligation under Article 3, section 1 of assuring Donnelly's compliance with the PLA. *Sheet Metal I*, 673 F. Supp. 2d at 322 n.16. First, as Sambe points out, the word "assure" is "susceptible to more than one

47

interpretation." (Sambe D.C. First Step Br. 50.) The phrase "assure compliance" could be interpreted as a guarantee that Sambe's subcontractors *would* adhere to all terms of the PLA. But the phrase "assure compliance" may also reasonably be interpreted to mean that Sambe would procure its subcontractors' assent to the PLA, thereby "assuring" that they, too, were bound by the PLA's terms. Because the phrase "assure compliance" is ambiguous, summary adjudication of the contract claim against Sambe was foreclosed. *See Tamarind Resort Assocs.*, 138 F.3d at 111.

Furthermore, the District Court erred by finding that there existed no genuine dispute of material fact concerning whether Sambe "assure[d]" Donnelly's compliance with the PLA sufficient to defeat Sheet Metal's summary judgment motion. *See Sheet Metal I*, 673 F. Supp. 2d at 322 n.16. The record contains evidence that Sambe notified Donnelly of Sheet Metal's claim to the work after Donnelly assigned it to Carpenters, and further reflects that Sambe asked Donnelly to resolve the claim. Donnelly then pursued its unfair labor practice charge that resulted in the assignment of the work to Carpenters. Thus, contrary to the District Court's conclusion, it is not "undisputed" that Sambe failed to assure Donnelly's compliance with the PLA. *See id.* Rather, there exists a genuine dispute of material fact concerning to what extent, if at all, Sambe acted to ensure that Donnelly complied with the PLA's hiring requirements, and thus whether Sambe satisfied its obligations under the PLA. Summary judgment was therefore improper.

As such, we hold that although the District Court was not required to deny Sheet Metal's summary judgment motion on its contract claim against Sambe on the ground that

48

the suit impermissibly sought breach of contract damages from the general contractor following a section 10(k) order of the Board, the District Court erred in granting summary judgment for Sheet Metal because the contract provision at issue is ambiguous and, furthermore, there exists a triable issue of fact concerning whether Sambe satisfied its obligations under the PLA. Accordingly, we will vacate the District Court's orders granting summary judgment for Sheet Metal and awarding it nominal damages of $1.00. *See UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 504 (3d Cir. 2004).

## IV.

For the foregoing reasons, we will deny Sheet Metal's petition for review of the District Court's December 8, 2011 decision and order, and grant the Board's cross-application for enforcement. We will vacate the orders of the District Court with respect to Donnelly and remand with directions to enter judgment in favor of Donnelly. We will likewise vacate the orders of the District Court with respect to Sambe and remand for the District Court to address the issue of contract liability in accordance with this opinion.